1
2
3
4
5              UNITED STATES DISTRICT COURT
6            NORTHERN DISTRICT OF CALIFORNIA
7

8  JULIUS LEE JACKSON,                    No. C 05-4889 MHP (pr)

9              Petitioner,                **ORDER DENYING PETITION FOR
                                          WRIT OF HABEAS CORPUS**
10       v.

11 RICHARD KIRKLAND, warden,

12             Respondent.
                                        /
13

14                     **INTRODUCTION**

15       Julius Lee Jackson filed this <u>pro se</u> action seeking a writ of habeas corpus under 28

16 U.S.C. § 2254.  The matter is now before the court for consideration of the merits of the

17 habeas petition.  For the reasons discussed below, the petition will be denied.

18                     **BACKGROUND**

19       The California Court of Appeal described the evidence:

20       Around 5:00 p.m. on May 23, 2001, 19-year-old Maria Buitrago and her friends
         Lorena (also known as Lucrecia) S., Joseph B. (age 17), and Orlando E. (age 12) were
21       "hanging out" at a train station in Redwood City.  Jackson was also in the area, trying
         to sell the group jewelry.  Joseph and Orlando began cussing at each other and play
22       fighting.  Both boys were laughing as they insulted each other in a joking manner.
         However, Jackson intervened and told Joseph he would "beat [his] ass" if Joseph did
23       not leave Orlando alone. Jackson warned he was "a street fighter" and told Joseph
         "you don't want to mess with me."  Joseph said nothing aggressive in response, but
24       turned and walked to a nearby bench.  Jackson followed and pushed Joseph over the
         bench, cutting Joseph's arm.  When Joseph stood up, Jackson punched him repeatedly
25       in the face.  Joseph "was basically stunned" and did not hit back.  When Joseph moved
         a short distance away from Jackson, Jackson grabbed his 12-inch radio and threw it,
26       striking Joseph in the back of his head.  Again, Joseph did not retaliate.  Jackson then
         moved back a few feet and drew a small pocket knife, which was attached to a
27       keychain.  As he displayed the knife, Jackson made threatening motions toward
         Joseph.  Lorena tried to pull Joseph away, and Buitrago called the police.  While
28       Buitrago was on the phone, Jackson boarded a train and left.  When Redwood City

**United States District Court**
For the Northern District of California

Police Officer Evan Paraskevopoulos arrived at the scene, he saw that Joseph had cuts on his face and arm and some blood inside his nose.  Joseph acted timid and appeared "scared."

Three weeks later, Officer Paraskevopoulos located and arrested Jackson.  At the time, Jackson still had the small keychain knife in his possession.  Jackson waived his Miranda . . . rights and gave a statement about the May 23 incident.  Jackson said he had seen Joseph at the train station many times before, and he asserted Joseph was "a known gang member to the police department."  Jackson said the altercation began because Joseph was brandishing a large hooked knife and trying to steal his stereo. Jackson said Joseph was dressed in red and was accompanied by 30 gang members. Officer Paraskevopoulos recalled that Joseph was not wearing red on the day in question, nor did he see such a large group of juveniles gathered in the area.  Jackson claimed he fled when he saw Joseph trying to steal the radio, though he said he might have knocked over Joseph as he was running away.  Jackson claimed he never hit or threatened Joseph.  He showed his pocket knife but only as a means of protecting himself.  When asked why he had not contacted the police, Jackson explained that he did not think Joseph had done anything wrong.

Cal. Ct. App. Opinion, pp. 2-3.

Following a jury trial in San Mateo County Superior Court, Jackson was convicted of assault with a deadly weapon or by means of force likely to produce great bodily injury.  See Cal. Penal Code §§ 245(a)(1).  With regard to the knife, he was acquitted of assault with it but was convicted of misdemeanor brandishing a knife.  See Cal. Penal Code § 417(a)(1). The jury found true allegations that Jackson had suffered three prior strike convictions, Cal. Penal Code § 1170.12(c)(2), had served three prior prison terms, Cal. Penal Code § 667.5(b), and had committed two prior felonies and two prior serious felonies, Cal. Penal Code § 667(a).   He was sentenced to 25 years to life in prison under California's Three Strikes law.

Jackson appealed.  His conviction was affirmed by the California Court of Appeal and his petition for review was denied by the California Supreme Court.  He also filed unsuccessful state habeas actions before filing this action.

Jackson's federal habeas petition alleged the following 21 claims for relief:  (1) his right to due process was violated when the trial judge sent a note to the jury during deliberations; (2) the trial judge committed judicial misconduct when he refused to put on the record a ruling on jury tampering and ignored Jackson's motion for a mistrial; (3) the trial judge erred in refusing to disqualify himself and refused to send Jackson's declarations regarding disqualification to the assignment judge; (4) Jackson was denied his right to a jury

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

trial on sentence enhancements and there was insufficient evidence to prove the prior convictions; (5) he received ineffective assistance of counsel in that counsel refused to have the trial judge deny Jackson's motion for a mistrial on the record; (6) he received ineffective assistance of counsel in that counsel refused to move for a mistrial and refused to move to disqualify the judge; (7) he received ineffective assistance of counsel in that counsel refused to request a fact-finding on the 1997 prison prior and refused to object to the documentary evidence; (8) his trial and appellate counsel had a conflict of interest; (9-12) he received ineffective assistance of appellate counsel on his appeal in certain specified ways; (13) the trial court erred in excluding evidence of victim Joseph Bettencourt's gang affiliation; (14) the trial court erred in instructing the jury that Jackson violated his discovery obligations; (15) the instructions on the defense-of-another theory were erroneous; (16) the trial court erred in permitting the late filing of an amended information; (17) there was insufficient evidence to support a felony assault conviction; (18) he was denied his right to a speedy trial; (19) he received ineffective assistance in that counsel failed to disclose to the prosecution a witness statement from Orlando Escobito; (20) prosecutorial misconduct in the closing argument; and (21) cumulative error.   Claims 3, 16, and 19 were earlier dismissed from this action at Jackson's request because he had not exhausted state court remedies for those claims.   Respondent filed an answer and Jackson filed a traverse.  The matter is ready for a decision on the merits of the petition.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over this habeas action for relief under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the challenged conviction occurred in San Mateo County, California, within this judicial district.  28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the

highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court.  <u>See</u> 28 U.S.C. § 2254(b), (c).  State court remedies were exhausted for the claims in the petition, except those three claims that were earlier dismissed for failure to exhaust.

**STANDARD OF REVIEW**

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  <u>Williams v. Taylor</u>, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case."  <u>Id.</u> at 413.  "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable."  <u>Id.</u> at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable."  <u>Id.</u> at 409.

**DISCUSSION**

A.    The Note To The Jury

During deliberations, the jury sent a note to the court asking for the definition of the word "likely."  The trial judge consulted with both attorneys and decided to further instruct with a legal dictionary definition of the word "likely."  See 9/20/01 RT 378.   The court then returned the jury note with a written response, although he did not call the jury into the courtroom to read that written response to the jury.  The jury question and response were on the same piece of paper:

> Question/Request:  What is meant by 'manner . . . likely to produce death or great bodily injury' in CALJIC 9.02?  Does 'likely' mean possible or highly probable?  What is the definition of 'likely' in CALJIC 9.02?

> Response:  As defined in Black's Law Dictionary[:]  Probable.  In all probability.  Likely is a word of general usage and common understanding broadly defined as of such nature or so circumstantial as to make something probable and having a better chance of existing or occurring than not.

CT 29 (ellipses in source).

Jackson contends that this procedure violated his right to due process and amounted to "judicial misconduct by trial judge, tampering with the jury outside open court."  Petition, p. 4.  Jackson also contends that, before this note was sent to the jury, "the record would suggest that all 'verdicts' had not guilty on them; and once done, a not guilty verdict had been void."  Petition, p. 6.   He is wrong on the law and the facts.

When a jury makes known its difficulties by asking a question, the court "should clear [the jury's difficulties] away with concrete accuracy."  Bollenbach v. United States, 326 U.S. 612, 612-13 (1946).  "Questions or disputes as to the meaning of terms which arise during jury deliberations should be settled by the court, after consultation with counsel, in supplemental instructions."  United States v. Birges, 723 F.2d 666, 670-71 (9th Cir.), cert. denied, 466 U.S. 943, and cert. denied, 469 U.S. 863 (1984).   That is what occurred here.  The trial court decided to use a legally correct definition of "likely" found in Black's Law Dictionary and used it after consulting with the attorneys.  Respondent incorrectly contends that the defense counsel agreed to the supplemental instruction: it was the prosecutor who

United States District Court
For the Northern District of California

United States District Court
For the Northern District of California

made the approving comment cited by respondent.  <u>See</u> RT 378.  Defense counsel objected. RT 379.  However, her objection does not show that the supplemental instruction was erroneous.  Her suggestion that no further instruction should be given other than to tell jurors to "rely on common understanding of the word," RT 379, would have done little to address the jury's expressed need for further guidance on what the word meant.  Jackson also has not shown that providing the supplemental instruction in writing rather than having the jury come back to the courtroom to hear that instruction read aloud was error.

Jackson's contention that this procedure amounted to jury tampering is wholly off base.  It simply was not jury tampering for the trial judge to provide a supplemental instruction in writing to the jury after consultation with the attorneys.  Nor did the response amount to an instance of judicial misconduct.  To the contrary, responding to such inquiries one of the routine duties of a trial judge.  <u>See</u> <u>Bollenbach</u>, 326 U.S. at 612-13 (judge is obligated to clear away confusion when the jury requests clarification).  Jackson's argument that the judge spoke to the jury off the record has zero evidentiary support.

Jackson's suggestion that the supplemental instruction was improperly given after "not guilty" verdicts had issued has no merit.  About seventy-five minutes after the first note went out, a second note was sent by the jury indicating the foreman had signed one of the wrong verdict forms.   CT 30 (jury note stating: "Judge - an error was made on one of the verdict forms – I signed the wrong form – what should be done?  The other (correct forms) have been signed.")  The reporter's transcript indicates that the court took this matter up "sometime later" after the supplemental instruction was sent to the jury.  RT 379.  The foreman confirmed to the court that the incorrect verdict was a mistake and not reflective of a change of heart.  RT 380.  The incorrect verdict was marked "void" and the correct verdicts were then read and the jurors polled on the guilty verdicts. RT 380-383, 386-388.  Each juror confirmed that the guilty verdicts on count 1 (i.e., assault with a deadly weapon and/or by means of force likely to produce great bodily injury) and count 3 (i.e., exhibiting a deadly weapon) were his or her verdicts.   The record simply does not support Jackson's assertion that there was any impropriety in the handling of the verdicts or that the supplemental

6

instruction had any effect on those verdicts.

Jackson is not entitled to the writ based on his challenges to the court's response to the jury note or the handling of the mistakenly signed verdict.

B.    <u>Judicial Misconduct Claim</u>

Jackson alleges that there was "judicial misconduct" at his trial because the trial judge refused to put on the record a ruling regarding "jury tampering."  Petition, p. 4.  This claim fails because it is flatly contradicted by the record.

At trial, the prosecutor stated that a juror apparently overheard a conversation between the victim's father and another witness.  A hearing was held.  The affected juror was questioned by the attorneys and the court; the juror reported overhearing a conversation about the case (to the effect that one of conversing parties "couldn't believe" the defense attorney was questioning the victim's character).  RT 108-113.  Defense counsel and the prosecutor made arguments, and then the other jurors were brought in to the courtroom.  The other jurors were asked if they had overheard anything and they confirmed that they had not.  RT 118-119.  An unreported sidebar discussion was held, RT 119, and the presentation of evidence resumed.  Two days later, the trial court permitted defense counsel to argue in support of the motion for a mistrial.  RT 368.  After considering the argument, the trial judge stated that he "denied the motion."  RT 369.

As the foregoing shows, there was a ruling on the record that the motion for a mistrial was denied.  Jackson's claim that there was not a ruling has no factual support.  Even if the judge had not explicitly stated that he denied the motion, the failure to explicitly rule on a motion would not amount to judicial misconduct as that term is commonly understood.  A trial judge's participation oversteps the bounds of propriety and deprives the parties of a fair trial only when the record discloses actual bias or leaves the reviewing court with an abiding impression that the judge's remarks or acts projected to the jury an appearance of advocacy or partiality.  <u>See</u> <u>United States v. Parker</u>, 241 F.3d 1114, 1119 (9th Cir. 2001).  Likewise, a juror overhearing a conversation pertaining to the trial would not amount to jury tampering as that term is commonly understood.  <u>See</u> <u>United States v. Dutkel</u>, 192 F.3d 893, 895 (9th

Cir. 1999) (jury tampering is generally understood to mean "an effort to influence the jury's verdict by threatening or offering inducements to one or more of the jurors.")  In sum, the factual basis for the claim is incorrect and the legal claim has no merit.

C.    Use of The 1997 Prior For Sentence Enhancement

    1.    State Court Proceedings

Jackson claims he was denied his rights to a jury trial and due process on a 1997 assault conviction that was used for sentence enhancement purposes.  He contends he was denied a jury trial on the issue of identity (i.e., whether he was the same person who suffered the 1997 conviction) and on the issue of whether the conviction was for a serious felony.  He also contends that there was insufficient evidence to prove the prior conviction was for a serious or violent felony.

As pertinent to this claim, the 2001 amended information alleged he had suffered a conviction on or about September 22, 1997 "of the crime of Penal Code section 245 in the County of San Mateo . . . within the meaning of Penal Code section 1170.12(c)(2)."  CT 232.

Section 1170.12(c)(2) provides the harsh sentencing scheme (e.g., 25-years-to-life-imprisonment) in California's Three Strikes Law.  An indeterminate life sentence applies under § 1170.12(c)(2) if the defendant has two or more prior felony convictions, as defined in § 1170.12(b)(1).  That provision, in turn, lists a prior conviction as any offense defined in § 667.5(c) as a violent felony or any offense defined in § 1192.7(c) as a serious felony.  Cal. Penal Code § 1170.12(b)(1).  Not all assaults are listed in § 1192.7(c); however, the list of serious felonies includes "any felony in which the defendant personally used a dangerous or deadly weapon."  Cal. Penal Code § 1192.7(c)(23).  As a result, a mere assault might not trigger § 1192.7's sentencing scheme but an assault in which the defendant personally used a dangerous or deadly weapon would.  Here, the question was whether Jackson had personally used a dangerous or deadly weapon in the 1997 assault.

Jackson did have a jury trial in 2001 on the existence of the 1997 assault conviction. The jury decided that he had suffered that conviction.  See RT 423.  However, the trial court decided the identity question and decided that the conviction was for a serious felony.

8

**United States District Court**
For the Northern District of California

1     The California Court of Appeal rejected Jackson's claim that the judge's role in the

2 decision-making process denied him a jury trial on the 1997 conviction.  The state appellate

3 court explained that the court rather than the jury determined whether a conviction was

4 serious for purposes of California sentence enhancement purposes.  The state appellate court

5 rejected the contention that the U.S. Supreme Court's <u>Apprendi</u> decision had overturned that

6 rule and explained that <u>Apprendi</u> reaffirmed the rule from <u>Almendarez-Torres</u> that a

7 defendant has no right to a jury trial on the fact of a prior conviction.  Jackson "was not

8 entitled to have the jury decide anything beyond whether he suffered the prior conviction

9 alleged in the information.  Because issues related to this conviction were unrelated to the

10 charged crime, and concerned only Jackson's recidivism, due process did not require them to

11 be decided by the jury."  Cal. Ct. App. Opinion, p. 26.

12     2.     <u>Analysis</u>

13     The Sixth Amendment to the United States Constitution guarantees a criminal

14 defendant the right to a trial by jury.  U.S. Const. amend. VI.  This right to a jury trial has

15 been made applicable to state criminal proceedings via the Fourteenth Amendment's Due

16 Process Clause.  <u>Duncan v. Louisiana</u>, 391 U.S. 145, 149-50 (1968).  The Supreme Court's

17 Sixth Amendment jurisprudence was significantly expanded by <u>Apprendi v. New Jersey</u>, 530

18 U.S. 466 (2000), and its progeny, which extended a defendant's right to trial by jury to the

19 fact finding used to make enhanced sentencing determinations as well as the actual elements

20 of the crime.  "Other than the fact of a prior conviction, any fact that increases the penalty for

21 a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved

22 beyond a reasonable doubt."  <u>Id.</u> at 488-90 (2000).  The "statutory maximum" for <u>Apprendi</u>

23 purposes is the maximum sentence a judge could impose based solely on the facts reflected

24 in the jury verdict or admitted by the defendant; that is, the relevant "statutory maximum" is

25 not the sentence the judge could impose after finding additional facts, but rather is the

26 maximum he or she could impose without any additional findings.  <u>Blakely v. Washington</u>,

27 542 U.S. 296, 303-04  (2004); <u>see, e.g.</u> <u>Cunningham v. California</u>, 549 U.S. 270 (2007)

28 (California's determinate sentencing law violated the Sixth Amendment because it allowed

1  the sentencing court to impose an elevated sentence based on aggravating facts that it found

2  to exist by a preponderance of the evidence).

3         Prior convictions represent a narrow exception to the constitutional right to a jury

4  determination of sentencing factors.  See Almendarez-Torres v. United States, 523 U.S. 224,

5  244 (1998).  In Almendarez-Torres, the Supreme Court carved out a "prior conviction

6  exception" that has been consistently recognized.  See Apprendi, 530 U.S. at 490 ("In sum,

7  our reexamination of our cases in this area, and of the history upon which they rely confirms"

8  that the right to a jury applies to all sentencing factors, "[o]ther than the fact of a prior

9  conviction.")  Recidivism "is a traditional, if not the most traditional, basis for a sentencing

10 court's increasing an offender's sentence."  Almendarez-Torres, 523 U.S. at 244.  "[T]o hold

11 that the Constitution requires that recidivism be deemed an 'element' of petitioner's offense

12 would mark an abrupt departure from a longstanding tradition of treating recidivism as

13 'going to punishment only.'"  Id.

14        The California Court of Appeal identified the correct controlling Supreme Court

15 precedent, Almendarez-Torres, and reasonably applied it in holding that the judge rather than

16 jury could find that the conviction was for a serious felony within the meaning of § 1170.12

17 and to decide the identity question.  There was no violation of Jackson's rights to a jury trial

18 or proof beyond a reasonable doubt when the judge imposed an enhanced sentence based on

19 the 1997 conviction.  Although Jackson would have a right to a jury trial for most facts that

20 result in an aggravated sentence, this right did not apply to the fact of a prior conviction.  See

21 Almendarez-Torres, 523 U.S. at 244.  Because the sentencing judge was able to make the

22 findings he did, he was legally able to give Jackson a Three Strikes sentence.

23        There also was sufficient evidence to support the finding that the 1997 assault

24 conviction was a serious felony.  Jackson argues that the documents before the decision-

25 maker were insufficient proof that the 1997 assault conviction was for a serious felony

26 because the 1997 abstract of judgment had an "S" notation on the provision for the §

27 1192.7(c)(23) enhancement that could have meant "stricken" or "stayed" and therefore made

28 the document hopelessly ambiguous.  This court disagrees.  Whether the "S" stood for

"stricken" or "stayed," the abstract of judgment nonetheless showed that the enhancement had been found true.  Section 2 on the abstract stated that "enhancements charged and found true" were to be listed an that the "enhancements charged but not found true or stricken under § 1385" were <u>not</u> to be listed.  CT 68.  The listing of the enhancement under "1192.7(c)(23)" for the count 1 conviction on assault with a deadly weapon under Penal Code § 245(a)(1) meant that the court in 1997 had found true the enhancement that the defendant had "personally used a dangerous or deadly weapon." <u>See</u>  Cal. Penal Code § 1192.7(c)(23); <u>see also</u> Cal. Penal Code § 969f (describing process for alleging serious felonies and pleading thereto).  Since Jackson had been found in 1997 to have personally used a dangerous or deadly weapon in the commission of the felony, that felony conviction was a serious felony under § 1192.7(c) and therefore could be counted under § 1170.12 for purposes of imposing an indeterminate life sentence in his 2001 criminal proceedings.

In addition to the 1997 abstract of judgment, there was other evidence before the judge that buttressed the finding that the 1997 conviction was for a serious felony, as the California Court of Appeal explained.  The charging information from the 1997 case alleged in Count 1: "on or about 04/27/1997, Julius Lee Jackson did willfully and unlawfully commit an assault upon [the victim] with a deadly weapon, to wit:  40 oz beer bottle, and/or by means of force likely to produce great bodily injury," and alleged that Jackson personally used a deadly or dangerous weapon in committing the offense.   CT 59-60.  The change of plea form signed by Jackson, his attorney, the prosecutor and the trial judge stated Jackson's desire to plead no contest to the assault charge and to admit the § 1192.7(c)(23) enhancement for personal use of a deadly weapon.  CT 64.  The court minutes listed only the charge and allegations (including the § 1192.7(c)(23) allegation) that were subject to the change of plea and dismissed "all remaining counts" and "all remaining special allegations."  CT 66.   The California Court of Appeal found this evidence sufficient to prove the 1997 assault was a serious felony.  Cal. Ct. App. Opinion, pp. 21-24.

The question of identity (i.e., whether the defendant is the same person who suffered the earlier conviction) came within the <u>Almendarez-Torres</u> exception to the <u>Apprendi</u> rule.

11

See United States v. Browning, 436 F.3d 780, 782 (7th Cir.), cert. denied, 547 U.S. 1215 (2006) (declining invitation to extend jury trial right to identity of defendant in prior conviction; "[t]he use of a prior conviction to enhance a defendant's sentence presupposes that it is a prior conviction *of him*, and if there is any doubt on that score the judge has to resolve it."); United States v. Carrillo-Beltran, 424 F.3d 845, 848 (8th Cir. 2005), cert. denied, 546 U.S. 1193 (2006) (no right a jury trial on whether a prior conviction occurring under an alias was attributable to defendant).  The recent Ninth Circuit case of Butler v. Curry, 528 F.3d 624 (9th Cir. 2008), cautioned that not all recidivism-related facts fall within the Almendarez-Torres exception, and found that the fact of the defendant's probationary status at the time of the crime could not be found by a trial judge because "[t]he fact that a defendant was on probation at the moment of the current crime. . . is not reflected in the documents of a prior conviction, nor, for that matter, may it be conclusively inferred from those documents." Butler, 528 F.3d at 645-46.  Butler does not require that the issue of identity be sent to the jury.   In fact, as the California Court of Appeal explained, California has foreclosed a jury trial on the issue of identity with the enactment of a statute that provides the "question of whether the defendant is the person who has suffered the prior conviction shall be tried by the court without a jury." Cal. Ct. App. Opinion, pp. 26-27; see generally People v. Towne, 44 Cal. 4th 63, 81 (Cal. 2008) (noting that earlier cases had determined defendant had no jury trial right on whether he was the person who previously was convicted).   Jackson is not entitled to the writ on his claims regarding the use of the prior conviction for sentence enhancement purposes.

D.   Ineffective Assistance of Trial Counsel Claims.

Jackson asserts numerous ineffective assistance of counsel claims with respect to his trial counsel: counsel refused to have the trial judge deny Jackson's motion for a mistrial on the record (Claim 5); counsel allegedly refused to move for a mistrial and refused to move to disqualify the judge (Claim 6); and counsel refused to request a fact-finding on his 1997 prison prior as well as refused to object to the documentary evidence (Claim 7).

The Sixth Amendment to the U.S. Constitution guarantees not only assistance, but

effective assistance, of counsel.  See Strickland v. Washington, 466 U.S. 668, 686 (1984).

The purpose of the right is to ensure a fair trial, and the benchmark for judging any claim of

ineffectiveness is "whether counsel's conduct so undermined the proper functioning of the

adversarial process that the trial cannot be relied upon as having produced a just result."  See

id.  To prevail on an ineffective assistance of counsel claim, a habeas petitioner must show

that (1) counsel's performance was "deficient," i.e., his "representation fell below an

objective standard of reasonableness" under prevailing professional norms, id. at 687-88, and

(2) prejudice flowed from counsel's performance, i.e., that there is a reasonable probability

that, but for counsel's errors, the result of the proceedings would have been different, see id.

at 691-94.

Jackson first urges that his trial counsel was ineffective in that she refused to have the

trial judge put on the record the denial of petitioner's motion for a mistrial.  This claim has no

merit.  As discussed in Section B, above, the record shows that the trial court did deny the

motion for mistrial on the record.  Jackson does not satisfy either prong of the Strickland test.

There was no need to ask for an action that was taken.  And there was no reasonable

probability that the result of the proceedings would have been different if counsel had

affirmatively demanded that the trial court put the ruling on the record when the court did put

it on the record.

Jackson next faults trial counsel for failing to move the court for a mistrial and failing

to move to disqualify the judge when the court opted to send a written clarifying jury

instruction to the deliberating jury instead of calling the jury back into court to read that

instruction to them.  This claim falters on both prongs of the Strickland test.  As explained in

Section A, above, sending a written response to the jury did not violate any constitutional

right Jackson possessed.  The procedure also did not violate state law or amount to

misconduct.  See in Re Jackson, San Mateo County Superior Court No. HC-1615, Oct. 22,

2004 Order of Denial (denying habeas petition).  The state habeas court explained that a

statutory or constitutional violation occurs only when the court gives the jury instructions or

evidence without first consulting counsel; here, the trial judge had consulted with counsel

13

before sending the supplemental instruction to the jury.  Id. at 2.  Because a motion for mistrial or a motion to disqualify the judge would have been futile, Jackson cannot show deficient performance.  Cf. Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be deficient performance).  The futility of the unfiled motion for mistrial and motion to disqualify the judge also show that there was no resulting prejudice to Jackson from the non-filing of those motions.

Jackson also urges that counsel was ineffective in the way she handled the trial on the prior convictions in that she did not request fact-finding on the 1997 conviction and did not object to the documents used to prove that conviction.  This claim fails on both prongs of the Strickland test.  The judge and jury did do the fact-finding necessary for the sentence enhancement based on the 1997 conviction and state law allowed prior convictions to be proven by documentary evidence alone.  See Section C; see also People v. Taunton, 129 Cal. App. 4th 1218, 1221, 1226 (Cal. Ct. App. 2005).  Before the jury trial on the priors began, defense counsel mentioned her limited ability to help her client on the matter of the prior convictions: "My examination of the status of the law is, that the only real objection I can make is a hearsay objection, which will be, presumably, overcome by the demonstration that these documents are all appropriately certified."  RT 398.   The court reviewed the documentation the prosecutor intended to use to prove the priors, and defense counsel unsuccessfully objected to the documentation.  See RT 398-405.  The jury trial on the priors then occurred, and it consisted of little more than a presentation of the documentary evidence, very limited instruction by the court, and very brief argument by the prosecutor.  Jackson's counsel did not make a closing argument, but Jackson does not explain what she could have said in a closing argument that would have made any difference; although he apparently was annoyed that counsel had not let the jury know that he would be sent to prison for 40-50 years, see RT 388 (complaining about counsel's failure to mention that he was facing a Three Strikes sentence in guilt-phase closing argument), that information would not have been proper in a closing argument because the jury was not entitled to consider the punishment that would be imposed based on the jury verdict.  His claims about counsel's

14

1  performance with regard to the prior convictions fail for lack of a showing of deficient

2  performance or prejudice.

3  E.    <u>Conflict Of Interest Between Trial and Appellate Counsel</u>

4       Jackson claims that there was a conflict of interest between his trial and appellate

5  counsel in that they "both worked in the same law office." Petitioner, p. 12. This claim is

6  frivolous. The two attorneys worked in the same office <u>building</u>, but otherwise were not

7  shown to have any connection to each other. When Jackson complained to the First District

8  Appellate Project (i.e., the entity that oversees private attorneys appointed to represent

9  indigent appellants) that his attorneys had a conflict based on their relationship, an attorney

10 from the Project wrote back that he had investigated and found no basis for concern because,

11 although the two attorneys had offices in the same building, "the offices were completely

12 separate and unrelated; they did not share a practice in any way, they did not share office

13 space, and they had no working or personal relationship. (Indeed, trial counsel has left that

14 building and is practicing elsewhere.)" Resp. Exh. 14.

15      The Sixth Amendment does guarantee a right to counsel with undivided loyalty, <u>see</u>

16 <u>Wood v. Georgia</u>, 450 U.S. 261, 271-72 (1981); <u>see also</u> <u>Strickland</u>, 466 U.S. at 685, but the

17 mere fact that appellate counsel and trial counsel worked in the same office building does not

18 show any impediment to that right. The claim is denied.

19 F.    <u>Ineffective Assistance of Appellate Counsel Claims</u>.

20      Jackson asserts numerous ineffective assistance of counsel claims against his appellate

21 counsel. He inexplicably claims appellate counsel was ineffective in that the appellate court

22 declined to appoint replacement counsel. (Claim 9.) Appellate counsel allegedly refused to

23 raise trial counsel's ineffectiveness in his opening brief (Claim 10), refused to raise the

24 judicial misconduct claim pertaining to the note to the jury (Claim 11), and refused to raise

25 the argument that the court had not denied Jackson's mistrial motion on the record and

26 refused to disqualify himself (Claim 12.)

27      The Due Process Clause guarantees a criminal defendant the effective assistance of

28 counsel on his first appeal as of right. <u>See generally</u> <u>Evitts v. Lucey</u>, 469 U.S. 387 (1985).

15

**United States District Court**
For the Northern District of California

Claims of ineffective assistance of appellate counsel are reviewed according to the standard set out in <u>Strickland</u>, 466 U.S. 668.  <u>See</u> <u>Miller v. Keeney</u>, 882 F.2d 1428, 1433 (9th Cir. 1989).  A petitioner therefore must show that appellate counsel's advice fell below an objective standard of reasonableness and that there is a reasonable probability that, but for counsel's unprofessional errors, he would have prevailed on appeal.  <u>See</u> <u>id.</u> at 1434 & n.9 (citing <u>Strickland</u>, 466 U.S. at 688, 694).  The Constitution does not require appellate counsel to raise every colorable or non-frivolous claim; to the contrary, effective appellate advocacy involves weeding out weaker claims in order to focus on stronger ones.  <u>See</u> <u>id.</u>  Appellate counsel therefore will frequently remain above an objective standard of competence and have caused his client no prejudice because he declined to raise a weak issue.  <u>See</u> <u>id.</u>  That is the case here.

Jackson has not shown how the appellate court's refusal to appoint replacement counsel demonstrated any ineffective assistance of appellate counsel.  The claim is therefore rejected.

None of the claims Jackson wanted appellate counsel to raise had any merit.  The claims concerning trial counsel's ineffectiveness were meritless, as discussed in Section D, above.  The claim that the judge engaged in judicial misconduct with regard to sending the note to the jury after consulting with counsel was meritless, as discussed in Section A, above. The claims that the court had not denied the mistrial motion on the record and failed to disqualify himself were meritless for the reasons discussed in Sections B and D, above. Appellate counsel specifically explained to Jackson several of the choices he had made in preparing the appeal.  <u>See</u> Petition Exhibits at pp. 203 of 273 through 211 of 273.  For example, appellate counsel explained the futility of certain challenges to prior convictions because Jackson had other prior convictions that could be used to reach the same sentence, explained that Jackson's sentence could actually be increased by 15 years if a particular sentencing error that had been made in Jackson's favor was noticed by the appellate court, and explained that the trial transcript precluded any serious argument about the note to the jury.  The correspondence to Jackson from appellate counsel and from the First Appellate

16

District show that appellate counsel made several considered strategic decisions to eliminate or reduce the emphasis on certain claims that were likely losers. Those choices were well within the range of competence for an appellate counsel. The claims for ineffective assistance of appellate counsel fail on both prongs of the <u>Strickland</u> tests.

G.    Exclusion Of Evidence Regarding Victim's Gang Affiliation

Jackson alleges the trial court erred in excluding evidence of the alleged gang affiliation of the victim, Joseph Bettencourt. He contends that the gang evidence was relevant to the reasonableness of Jackson's conduct in defending Orlando, was admissible to show the bias of all the witnesses, and was admissible to corroborate Jackson's statements.

Only a limited part of the evidence about Joseph's possible gang ties was excluded. When the court initially considered the matter after Joseph's direct testimony and in connection with consideration of Joseph's high school disciplinary records, there had not been evidence developed of a gang-related threat to permit defense counsel to explore the issue. Joseph's high school records were described as showing that he had been suspended for having a knife, suspended for consuming alcohol during a school day, and disciplined for wearing gang hats or gang colors. The school records also contained statements that Joseph often wore a red hat with "XIV" and "Mafia" written on it; those markings allegedly had street gang connotations. The prosecutor contested use of the evidence about the wearing of red, arguing that various witnesses, the victim, and the responding police officer did not see Joseph wearing red at the scene of the crime. Defense counsel argued that the evidence was relevant because Jackson believed that Joseph was involved with a gang based on his attire and past occasions when he had encountered Joseph. The court then observed that there had not yet been evidence of any threat from any gang or gang member to Jackson, but also observed that if threat evidence ever was introduced, then defense counsel could question Joseph in that area. RT 45-48. The trial court allowed the defense to question Joseph on whether he possessed a knife at school and during the altercation with Jackson. RT 48-49.

During the cross-examination of Joseph, defense counsel asked several gang-related questions. Joseph testified that he did not see any gang members in the area of the train

17

1    station on the day of the crime; that he was familiar with gang members, gang colors and

2    gang symbols; that he would know a gang member if he saw one; that one of the ways he

3    would identify someone as a gang member was by the colors or symbols he wore; that red

4    was a gang color for the Nortenos, who were "gang bangers;" and that he was familiar with

5    the Roman numeral XIV.  RT 57-58.  The trial court excluded three gang-related questions

6    posed to Joseph, i.e., whether he understood the significance of the gang symbol XIV,

7    whether he generally wore the color red, and whether he socially associated with the

8    Nortenos street gang.  RT 59.

9            The California Court of Appeal determined that the evidence was improperly

10   excluded under state law.

> Jackson was entitled to present evidence bearing upon his state of mind and the
> reasonableness of his interpretation of Joseph's actions toward Orlando. [Citation.]
> Because Jackson did not testify, the statement Jackson gave when he was arrested
> formed the primary evidence of his state of mind.  Jackson told the police he had seen
> Joseph at the train station many times before the incident, and he asserted Joseph was
> "a known gang member to the police department."  Although Officer Paraskevopoulos
> refuted related aspects of this statement (i.e., Joseph was not wearing red or
> surrounded by 30 gang members on the day of the assault), the jury could infer from
> the statement that, from his past observations of Joseph, Jackson believed Joseph was
> a gang member.  Evidence that Joseph identified himself as a gang member, or often
> wore gang-related clothing, was relevant to support the reasonableness of this belief as
> a justification for Jackson's actions, and the trial court erred in excluding this
> evidence.

18   Cal. Ct. App. Opinion, p. 10.  The state appellate court stated that the error was only a state

19   law error and that under the state law standard, the evidence was harmless because it was not

20   reasonably probable the jury would have reached a result more favorable to Jackson had the

21   evidence been admitted.  Id.[1]  The court explained that Jackson's defense that he acted to

22   defend Orlando was weak and was contradictory to the story Jackson told police.  Also, the

23   witnesses were uniform in their testimony that Jackson was the aggressor and that Joseph did

24   not fight back.  Further, the evidence had very slight value to impeach witnesses because it

25   did not actually show that Joseph was a gang member, but only provided indications from

26   which Jackson reasonably might have believed him to be one.  Id. at 10-11.

27          The U.S. Constitution gives a criminal defendant the right to present a defense.

28   "Whether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in

**United States District Court**
For the Northern District of California

18

the Compulsory Process or Confrontation clauses of the Sixth Amendment, . . . the Constitution guarantees criminal defendants 'a meaningful opportunity to present a complete defense.'" Crane v. Kentucky, 476 U.S. 683, 690 (1986) (citations omitted).  The Compulsory Process Clause of the Sixth Amendment preserves the right of a defendant in a criminal trial to have compulsory process for obtaining a favorable witness.  Washington v. Texas, 388 U.S. 14, 19 (1967).  This right was held applicable to the states through the Fourteenth Amendment.  See id. at 18-19. The Sixth Amendment right to present relevant testimony "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. 284, 295 (1973); Taylor v. Illinois, 484 U.S. 400, 410-11 (1988) (right to compulsory process is not absolute).  Thus, the accused's compulsory process right may be limited by evidentiary rules.  See Perry v. Rushen, 713 F.2d 1447, 1453-54 (9th Cir. 1983) (no violation of compulsory process to prohibit evidence of third party identity because evidence collateral and state interest in evidentiary rule overriding), cert. denied, 469 U.S. 838 (1984);  cf. Montana v. Egelhoff, 518 U.S. 37, 42-43 (1996) (defendant does not have an unfettered right to offer evidence that is incompetent, privileged or otherwise inadmissible under standard rules of evidence; the exclusion of evidence does not violate the Due Process Clause unless it offends some fundamental principle of justice).  Even if the exclusion of evidence was a constitutional error, the erroneous exclusion must have had "a substantial and injurious effect" on the verdict for habeas relief to be granted.  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993).

The exclusion of the gang evidence was, at most, harmless error.  Evidence that a victim is in a gang is quite inflammatory, and the trial court recognized that problem.  The trial court tried to chart a course that would allow the defense to develop evidence of a gang connection for Joseph if there was some support for Jackson's activities as being responsive to a gang threat or attack, but not allow the defense to suggest that Joseph deserved a beating just for his alleged status as a gang member that was not then being manifested in any activity.  The main problem for Jackson is that his evidence that Joseph was doing any gang-related thing on the day Jackson assaulted him was so very, very weak.

United States District Court
For the Northern District of California

Insofar as Jackson was trying to establish support for his defense of Orlando, the gang evidence would have been of very little value.  To accept that Jackson hit Joseph thinking it was necessary to try to defend Orlando, the jury would have to disbelieve Jackson's statements to police that he never struck Joseph and that Joseph was trying to steal Jackson's stereo at knife-point while at the same time believe Jackson's statement to police that Joseph was dressed in red and accompanied by 30 gang members.  The jury also would have to disbelieve all the eyewitnesses' testimony that Jackson was not wearing red and that there was not a large gang  present while at the same time believe the statements of the witnesses that Joseph and Orlando were cussing and play-fighting <u>and</u> believe that this could have been perceived by Jackson to be a genuine fight.  The jury also would have to disbelieve the police officer's testimony that Joseph was not wearing red at the crime scene, and would have had to disregard the police photograph of Joseph that day that didn't show any red clothes on him.  Asking a jury to cobble together a story this way had virtually no chance of success.  As the state court of appeal noted, the evidence the defense wanted to introduce suggested at most that Joseph belonged to, or wanted to belong to, a street gang and did little to establish that Jackson believed Joseph posed an imminent threat of harm to Orlando.

Insofar as the evidence of Joseph's alleged gang affiliation would have been used to impeach the eyewitnesses' credibility, it was of very, very limited value.  Not only had the eyewitnesses (who were Joseph's acquaintances) testified that Joseph was not wearing red and no gang present, the responding police officer also testified that Joseph was not wearing red and that no gang was present.

Insofar as the evidence of Joseph's alleged gang affiliation would have been used to support the story Jackson told police – that Joseph was trying to rob him at knifepoint – that story was highly implausible to begin with, and Joseph's alleged gang affiliation would not have made it any more plausible.  It is extremely difficult to believe that anyone affiliated with a gangmember would call the police for help while the gangmember was attacking someone; here, the jury would have had to believe Maria Buitrago called 9-1-1 while her friend was trying to rob Jackson in the presence of about 30 other members of his gang.  It

also is extremely difficult to believe that a victim of a gang-related robbery attempt would have left the area and not bothered to report it to the police – which is what the jury would have had to believe to accept Jackson's story.  Most importantly, neither the eyewitnesses nor the responding police officer testified that Joseph was in red gang clothes or that there was a gang of about 30 present at the train station that day.

Finally, it is important to note that the gang evidence was sought to be introduced for impeachment and as relevant to Jackson's state of mind.  That is how the state courts analyzed it.  Defense counsel did not argue that the evidence was admissible to establish that, as an alleged gang member, Joseph was more likely to have been trying to rob Jackson or actually been beating up Orlando when Jackson hit him.  Had the defense been allowed to develop character evidence regarding Joseph's reputation and connection to a gang (if it existed), that might have allowed the prosecution to develop evidence of Jackson's character under California Evidence Code § 1103.  That result would have been disastrous for the defense because Jackson had a history of committing unprovoked attacks like the one he was accused of inflicting on Joseph.  Jackson's violent history apparently included one incident in which he threw a 40-ounce beer bottle at someone after inexplicably becoming agitated in a pizza parlor and another incident in which he robbed someone by hitting him in the back of the head, pushing him to the ground and ripping open his pockets.  See RT 12/5/02 RT 25-26, 31 (discussion of Jackson's criminal history at the sentencing hearing).  Had evidence of the victim's and defendant's characters been introduced, Jackson certainly would not have fared any better with the jury.

The trial court's restrictions that limited (but did not eliminate) inquiry into the possibility of a gang connection for Joseph did not have a substantial and injurious effect on the jury's verdict.  Jackson is not entitled to the writ on this claim.

H.   Instruction Regarding Defense Discovery Violation

Jackson claims that the trial court erred in instructing the jury that Jackson had violated his discovery obligations.  The jury instruction the court gave was a very mild sanction after the defense delayed in producing an August 4, 2001 investigative report that

had a witness statement for Orlando Escobito until the first day of trial, on September 17, 2001, and therefore not in compliance with the requirements in California Penal Code §§ 1054.3 and 1054.7 that the witness statement be produced to the prosecutor 30 days before trial. The prosecutor requested that CALJIC 2.28 be read to the jury. Defense counsel explained that the non-disclosure had been inadvertent and argued that it was non-prejudicial because the prosecutor knew of the witness. As a compromise, the judge gave a significantly modified version of that instruction in order to prevent any prejudice to Jackson and to "accurately [portray] the situation." RT 288. The instruction ultimately given to the jury explained that both defense and prosecution were required to disclose to each other before trial the evidence each intended to present at trial, with disclosure to take place at least 30 days in advance of trial except as to material discovered within 30 days of trial (which had to be disclosed immediately). The instruction also stated that the defense had failed to timely produce the statement from Orlando without lawful justification, but the court had permitted the production of the evidence from him. The instruction concluded with this information: "The weight and significance of any delayed disclosures, are matters for your consideration. However, you should consider whether the untimely disclosed evidence pertains to a fact of importance, something trivial, or subject matters already established by other credible evidence, witnesses." RT 303-304. Jackson contends that the instruction was improper because he did not know his attorney had not disclosed the statement, Orlando was already known to the prosecution, and the prosecutor had Orlando on his witness list at one time.

The instruction was determined to be warranted under state law by the California Court of Appeal. See Cal. Ct. App. Opinion, pp. 14-17. That court rejected Jackson's argument that, under state law, a defendant is not obliged to disclose the witness statement of a witness the prosecution also may intend to call as a witness. Id. at 15.

As respondent correctly notes, the claim urged in Jackson's federal petition related to this instruction is a claim for a state law error. In a habeas action, a federal court has jurisdiction to issue the writ to remedy violations of the laws, treaties, or Constitution of the United States, see 28 U.S.C. § 2254(a), but not to remedy violations of state law. Estelle v.

McGuire, 502 U.S. 62, 67-68 (1991).  The claim that the state court erred in its interpretation and application of state law therefore must be rejected as beyond the scope of federal habeas.

Even if the claim was construed to be a claim for a Sixth Amendment violation – as Jackson asserted in state court but not in his federal petition – the claim would fail.  The right to present testimony as part of a defense is not without limitation and "may, in appropriate cases, bow to accommodate other legitimate interests in the criminal trial process." Chambers v. Mississippi, 410 U.S. at 295.  In pursuit of the right to present a defense, "the accused, as is required of the State, must comply with established rules of procedure and evidence designed to assure both fairness and reliability in the ascertainment of guilt and innocence." Id. at 302.  Trial courts therefore may require that trial witnesses be disclosed before trial and may impose sanctions on defendants (including evidence preclusion) in appropriate circumstances when those requirements are violated.  See Taylor v. Illinois, 484 U.S. 400, 410-16 (1988) (exclusion of proposed defense witness not timely disclosed); Michigan v. Lucas, 500 U.S. 145, 149 (1991) (evidence sanction for failing to comply with notice requirements of rape shield law did not per se violate Sixth Amendment right to present a defense); United States v. Nobles, 422 U.S. 225, 241 (1974) (evidence preclusion sanction based on defense failure to comply with pretrial discovery rule to disclose proposed witness' investigative report did not violate Sixth Amendment).  In light of the Supreme Court's determinations that sanctions following discovery violations are permissible, there is no merit to Jackson's assertion that a defendant has a blanket Sixth Amendment right not to disclose trial evidence.  In Taylor, Lucas, and Nobles, the sanction imposed was preclusion of part of the defense evidence, a sanction much harsher than the very mild sanction of the jury instruction used in Jackson's case.  The instruction was tailored to the particular problem in Jackson's case: the trial judge deleted any reference to intentional concealment and did not tell the jury to disbelieve or ignore the evidence.  Jackson has not shown a Sixth Amendment violation resulting from the instruction given.

Further, even if the giving of the instruction in Jackson's case was error, it did not have the necessary "substantial and injurious effect" on the verdict for habeas relief to be

granted.  <u>Brecht</u>, 507 U.S. at 623.  As the state appellate court explained in its conclusion that any state law error would have been harmless, Orlando's testimony was "more hurtful than helpful for the defense" in that he provided few details favoring Jackson and provided testimony harmonious with prosecution witnesses in describing Jackson as the instigator and Joseph as the passive victim.  Cal. Ct. App. Opinion, p. 16.  The jury instruction did not tell the jury to ignore Orlando's testimony, but only that the delayed disclosure was a matter to be considered.  Even if the jury had taken the most negative view of Orlando's statements (such as disbelieving him or ignoring his testimony) because of the delayed production of his statement, it would not have changed the result at trial or given the jury a different picture of the events at the train station because Orlando's testimony was consistent with that of the prosecution witnesses.

I.    <u>Defense-of-Another Instructional Error Claim</u>

Jackson alleges that the jury instructions on the defense-of-another theory were erroneous.  As he did on his direct appeal, urges that the trial court had failed to <u>sua</u> <u>sponte</u> modify the instruction.  Specifically, he contends that the court should have elaborated on the CALJIC instructions on defense-of-another to (a) add a statement that a person need not retreat before acting to defend a third party and (b) add a statement that actual danger is not necessary to justify the use of force to defend a third part.

Defense counsel requested general instructions on self-defense and defense-of-another.  The court complied and gave the pattern instructions on these two defenses, i.e., CALJIC 5.30, 5.31, 5.32, 5.50, 5.51, 5.52, and 5.56.  The defense proposed <u>no</u> modifications to these instructions during trial.  The instruction on defense-of-another provided: "It is lawful for a person who, as a reasonable person, has grounds for believing and does believe that bodily injury is about to be inflicted upon Orlando Escobito to protect that individual from attack. [¶] In doing so, he may use all force and means which that person believes to be reasonably necessary and which would appear to a reasonable person, in the same or similar circumstances, to be necessary to prevent the injury which appears to be imminent."  RT 318-318; CALJIC 5.32.

**United States District Court**
For the Northern District of California

United States District Court
For the Northern District of California

1    The California Court of Appeal rejected both of Jackson's arguments.  First, it rejected

2    Jackson's argument that the court should have added an instruction that the person need not

3    retreat before acting to defend a third party.  Jackson had urged that the court should have

4    given an instruction similar to CALJIC 5.50, which provides that a person need not retreat

5    before using force in self-defense.  Under California law, there was a duty to <u>sua sponte</u>

6    instruct on particular defenses and their relevance to the charged offense arises "'if it appears

7    that the defendant is relying on such a defense, or if there is substantial evidence supportive

8    of such a defense and the defense is not inconsistent with defendant's theory of the case.'"

9    Cal. Ct. App. Opinion, p. 18 (quoting <u>People v. Sedeno</u>, 10 Cal. 3d 703, 716 (Cal. 1974)).

10   However, the "no retreat" instruction was not required because the "no retreat" rule was not a

11   general principle of California law.  <u>Id.</u>   The court noted the dearth of case law holding that

12   the rule applied to defense-of-another, and thought the rule made little sense in the context of

13   defending a third party: "A person who is under no threat of attack himself would seem to

14   have no reason to flee the scene, and therefore we do not see the logic in instructing a jury

15   that such a person need not flee before acting to defend another.  Moreover, because it is

16   unsupported by case law or other authority, this concept is certainly not a 'general principle

17   of law' requiring a sua sponte instruction."  <u>Id.</u>

18        Second, the California Court of Appeal rejected Jackson's argument that the court

19   should have added an instruction that actual danger was not necessary to justify the use of

20   force to defend another.  Jackson had urged that the court should have given an instruction

21   similar to CALJIC 5.51, which provides that actual danger is not necessary to justify self-

22   defense.[2]  The state appellate court found that the instructions, considered together,

23   adequately conveyed this information to the jury.  "Although CALJIC 5.51 explicitly states

24   that actual danger is not required to support a claim of self defense, this same concept was

25   conveyed to the jury in the instruction on defense of another.  By explaining that a person

26   may lawfully defend another if the person reasonably believes there is a danger and the use

27   of force to defend the other person 'appear[s]' to be necessary, CALJIC No. 5.32 makes it

28   clear a defendant's reasonable perception of danger, and not actual danger, is all that is

required." Cal. Ct. App. Opinion, pp. 19-20. Since CALJIC 5.32 adequately conveyed the concept covered by CALJIC 5.51, the state appellate court also rejected as unreasonable Jackson's speculation that a comparison of CALJIC 5.51 and CALJIC 5.32 may have led the jurors to erroneously believe the law was more forgiving of a person acting in self-defense.

Federal habeas relief is available when an erroneous jury instruction so infects the entire trial that the resulting conviction violates due process. See Estelle v. McGuire, 502 U.S. at 72. A defendant generally is entitled to have the jury instructed on his defense theory, but whether a constitutional violation has occurred in the failure to do so will depend on the evidence in the case and the overall instructions given to the jury. See Duckett v. Godinez, 67 F.3d 734, 745 (9th Cir. 1995), cert. denied, 517 U.S. 1158 (1996). There must be some evidence to support the instruction in order for there to be a duty to instruct. Id at 743.

The California Court of Appeal's rejection of Jackson's claim was not contrary to or an unreasonable application of clearly established federal law. Although that court did not discuss the federal constitutional claim, it did determine that the California law of defense-of-another did not include a "no retreat" rule. The state court's interpretation of state law binds a federal court sitting in habeas corpus. Bradshaw v. Richey, 546 U.S. 74, 76 (2005); Hicks v. Feiock, 485 U.S. 624, 629 (1988). Because California law did not have the rule, it follows that there was no constitutional error in not instructing that such a rule existed.

Nor was there a constitutional error in not providing a separate instruction that the reasonable appearance of danger to a third party is sufficient for defense-of-another to apply. The concept was adequately embodied in the CALJIC 5.32 instruction that was given to the jury. The instruction made it clear that it was not necessary for there to be actual danger for Jackson's defense-of-another defense to be established. There is no reasonable likelihood that the jury applied the instructions in a way that violated the Constitution. See Estelle v. McGuire, 502 U.S. at 72. Jackson is not entitled to the writ on this claim.

J.    Sufficiency Of The Evidence

Jackson alleges that his right to due process was violated because the evidence was

United States District Court
For the Northern District of California

1    insufficient to support the felony assault conviction.  Specifically, he contends that the

2    evidence was insufficient because the victim sustained only "one minor cut."  Petition, p. 17.

3        The California Court of Appeal rejected this claim.  The appellate court assumed the

4    jury found every fact the jury reasonably could have deduced from the evidence and inquired

5    "whether any reasonable trier of fact could have found the defendant guilty beyond a

6    reasonable doubt."  Cal. Ct. App. Opinion, p. 21.  Using that test, there was sufficient

7    evidence of a felony assault.

8        The evidence clearly established that Jackson perpetrated a violent physical attack,
     using force that was likely to produce great bodily injury.  Three witnesses described
9        how Jackson punched Joseph several times in the face.  He also pushed Joseph over a
     bench, cutting Joseph's arm.  When Joseph tried to retreat, witnesses testified that
10       Jackson struck him in the back of his head with a radio.  Jackson's attempt to
     downplay this violence by trivializing the extent of his victim's injuries is not
11       persuasive.  In analyzing the sufficiency of evidence to support a conviction for
     assault by means of force likely to produce great bodily injury, "the essential
12       determination is whether the force was likely to produce great bodily injury rather
     than the actual injury incurred. [Citation.]" (In re Nirran W. (1989) 207 Cal.App.3d
13       1157, 1161-1162.)  Substantial evidence supports the jury's conclusion that Jackson
     used sufficient force to support a conviction for aggravated assault.  (See, e.g., id. at p.
14       1162 [single blow to unsuspecting victim sufficient to support felony assault
     conviction].)

15   Cal. Court App. Opinion, p. 21.

16       The Due Process Clause "protects the accused against conviction except upon proof

17   beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

18   charged."  In re Winship, 397 U.S. 358, 364 (1970).  A federal court reviewing collaterally a

19   state court conviction does not determine whether it is satisfied that the evidence established

20   guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence

21   in the light most favorable to the prosecution, any rational trier of fact could have found the

22   essential elements of the crime beyond a reasonable doubt.'"  Jackson v. Virginia, 443 U.S.

23   307, 319 (1979); see Payne v. Borg, 982 F.2d 335, 338 (9th Cir. 1992), cert. denied, 510 U.S.

24   843 (1993).  Only if no rational trier of fact could have found proof of guilt beyond a

25   reasonable doubt may the writ be granted.  See Jackson, 443 U.S. at 324; Payne, 982 F.2d at

26   338.  Under § 2254(d), a federal habeas court applies the standards of Jackson with an

27   additional layer of deference.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir. 2005), cert.

28

denied, 546 U.S. 1137 (2006).  Generally, a federal habeas court must ask whether the state court decision reflected an unreasonable application of Jackson and Winship to the facts of the case.  Id. at 1275 (quoting 28 U.S.C. § 2254(d)).

The California Court of Appeal's decision was not contrary to or an unreasonable application of Jackson and Winship.  The state appellate court correctly identified the controlling legal principle, albeit without mentioning either of the U.S. Supreme Court cases.  And that court also reasonably applied the cases to Jackson's case.  The state court explained that Jackson's argument that the victim suffered only a minor injury was misguided.  Under state law, it was whether the force used was likely to produce great bodily injury rather than how badly the victim was actually injured that was relevant to the question whether there was an assault with force likely to result in great bodily injury.  Also, "great bodily injury" meant "significant or substantial bodily injury or damage; it does not refer to trivial or insignificant injury or moderate harm."  CALJIC 9.02.  With the inquiry properly focused on the force used, one must conclude that there was sufficient evidence to support the conviction.  Witnesses testified that Jackson punched Joseph repeatedly in the face, pushed him backwards over a bench, and then hit him in the back of the head with a radio.  The evidence was that Jackson swung or hurled the radio at Joseph's head using both hands.  RT 30-31, 101-102.  The radio was not introduced as evidence but there was testimony about its dimensions:  it was about a foot long and about 4 inches wide, was "bulky like one of those old radios."  RT 30-31, 101.  Hurling a radio of that size with both hands at the someone's head reasonably could be viewed as use of force likely to produce great bodily injury.  The jury also could observe that Jackson was noticeably larger than Joseph.  See RT 87 (Joseph was 5'7" and weighed about 136 pounds); CT 081 (1997 fingerprint card listing Jackson as 6'1" and 190 pounds).  Joseph suffered some injuries, albeit not severe ones.  There was testimony that Joseph had a cut on his left arm, scratches on his face and chin, and a bloody nose.  Although these injuries may not have been severe and this may not have been the most ferocious assault ever, there was sufficient evidence to support the jury's finding beyond a reasonable doubt that Jackson had committed an assault by means likely to produce great

bodily injury.   There was not a due process violation.

K.    <u>Speedy Trial Claim</u>

Jackson contends he was denied his right to a speedy trial because his trial did not commence until 68 days after the information was filed against him.  This claim was asserted in state court as a claim for a violation of Jackson's statutory rights under California Penal Code § 1382.

The California Court of Appeal described the factual background pertaining to the speedy trial issue.  The district attorney filed a complaint on June 15, 2001 and an information on July 11, 2001.  Trial was set to begin on Monday, August 27, 2001.  On August 23, 2001, defense counsel moved for a continuance because she was unprepared for trial due to the need to further investigate the documentary evidence (especially regarding Jackson's criminal history) and witnesses.  The court denied the motion for a continuance that day because defendant refused to waive time, but on August 27 did grant a continuance until September 10 after counsel renewed her request (over Jackson's objection) and the trial court found good cause for a continuance based on counsel's need for further investigation.  On September 10, 2001, the court granted an additional one-week continuance "because, over the weekend, a member of defense counsel's family was the victim of a serious crime" and due cause supported the postponement.  Cal. Ct. App, Opinion, p. 5.

The California Court of Appeal rejected Jackson's contention that the continuance violated his state right to a speedy trial, finding that there was no error in the trial court's finding of good cause for the short continuances before trial, that the delay was minimal, and that there was no claim that Jackson' suffered any prejudice as a result of the delay.

Respondent correctly notes that this claim, as alleged, does not state a claim cognizable in a federal habeas proceeding because Jackson asserts only a state law claim.  Jackson's allegations identify only the state statutory right and not the Sixth Amendment's speedy trial provision as the source of his claim.  Even if the claim was construed to be an assertion of a violation of the Sixth Amendment's speedy trial provision, it would have no merit.

United States District Court
For the Northern District of California

A speedy trial is a fundamental right guaranteed by the Sixth Amendment to the Constitution and imposed by the Due Process Clause of the Fourteenth Amendment on the states.  Klopfer v. North Carolina, 386 U.S. 213, 223 (1967).  No per se rule has been devised to determine whether the right to a speedy trial has been violated.  Instead, courts must apply a flexible functional analysis, Barker v. Wingo, 407 U.S. 514, 522, 530 (1972), and consider and weigh the following factors in evaluating a Sixth Amendment speedy trial claim: (1) length of the delay; (2) the reason for the delay; (3) the defendant's assertion of his right; and (4) prejudice to the defendant.  Doggett v. United States, 505 U.S. 647, 651 (1992); Barker, 407 U.S. at 530; United States v. Lam, 251 F.3d 852, 855, amended, 262 F.3d 1033 (9th Cir.), cert. denied, 534 U.S. 1013 (2001).  The length of the delay is to some extent a triggering mechanism.  Unless there is some delay which is "presumptively prejudicial," there is no necessity for inquiry into the other factors.  Doggett, 505 U.S. at 651-52.  Presumptive prejudice is not dispositive and instead is simply part of the mix of relevant facts and its importance increases with the length of the delay.  United States v. Gregory, 322 F.3d 1157, 1162 (9th Cir. 2003).  Depending on the nature of the charges, the lower courts have generally found post-accusation delay presumptively prejudicial at least as it approaches one year.  Doggett, 505 U.S. at 652 n.1; see, e.g., McNeely v. Blanas, 336 F.3d 822, 826 (9th Cir. 2003) (three-year delay was presumptively prejudicial); Gregory, 322 F.3d at 1162 (22-month delay between first superseding indictment and trial date was presumptively prejudicial but did not weigh heavily in defendant's favor because it was not excessively long).

Applying the Barker factors here leads to a conclusion that Jackson's right to a speedy trial was not violated.  First, the delay was minimal: Jackson's trial commenced 68 days after the information was filed and 92 days after the original complaint was filed.  Second, there were reasonable justifications for the short delay: his counsel needed more time to prepare and investigation Jackson's case and later obtained a week continuance due to a personal family problem.  The prosecutor also apparently obtained a one-week extension when his investigator was unavailable.  Finally, there is a complete absence of any showing of

1    prejudice to Jackson from the delay.  There was no Sixth Amendment speedy trial violation.

2    L.    Prosecutorial Misconduct Claim.

3    Jackson alleges that the prosecutor engaged in misconduct when, during his rebuttal

4    closing argument, he urged jurors to view the case as community members rather than as

5    impartial judges of the facts:   The prosecutor argued:  "The jury is made up of people in the

6    community.  The jury's job is to decide what the defendant did, the things that he did in their

7    community that fit the statute. [¶] So the ultimate question is, is this behavior appropriate in

8    your neighborhood?"  RT 355.

9    The California Court of Appeal rejected the claim that this comment urged the jurors

10   to view the case as community members instead of as impartial judges of the facts and

11   amounted to misconduct.  In context, the prosecutor's question was not such an

12   impermissible invitation for juror to step outside their neutral role.  "Just before this question,

13   the prosecutor reminded jurors their 'job' was 'to decide what the defendant did' and whether

14   the things he did were illegal under the criminal statutes.  The prosecutor did not urge jurors

15   to convict Jackson to preserve order or deter future crimes, he simply appealed to the jurors

16   as members of the community to hold Jackson accountable for his behavior."  Cal. Ct. App.

17   Opinion, p. 13.

18   The appropriate standard of review for a prosecutorial misconduct claim in a federal

19   habeas corpus action is the narrow one of due process and not the broad exercise of

20   supervisory power.  Darden v. Wainwright, 477 U.S. 168, 181 (1986).  A defendant's due

21   process rights are violated when a prosecutor's comments render a trial fundamentally unfair.

22   Id.; Smith v. Phillips, 455 U.S. 209, 219 (1982) ("the touchstone of due process analysis in

23   cases of alleged prosecutorial misconduct is the fairness of the trial, not the culpability of the

24   prosecutor.")  Under Darden, the inquiry is whether the prosecutor's remarks were improper

25   and, if so, whether the comments infected the trial with unfairness.  Tan v. Runnels, 413 F.3d

26   1101, 1112 (9th Cir. 2005), cert. denied, 546 U.S. 1110 (2006).  In deciding whether there

27   has been prosecutorial misconduct, the court can consider whether the comment was

28   responsive to something done by the defense.  See Darden, 477 U.S. at 182; see also United

United States District Court
For the Northern District of California

States v. Young, 470 U.S. 1, 5 (1985) (prosecutor's comment that he personally thought the defendant was guilty had to be viewed in context of defense counsel's earlier statement that "there's not a person in this courtroom including those sitting at this table who think [defendant] intended to defraud [the victim]").   The "invited response" rule does not give a prosecutor permission to respond to improper argument with his own improper argument, but instead is an analytic tool.

> [T]he issue is not the prosecutor's license to make otherwise improper arguments, but whether the prosecutor's 'invited response,' taken in context, unfairly prejudiced the defendant. [¶] In order to make an appropriate assessment, the reviewing court must not only weigh the impact of the prosecutor's remarks, but must also take into account defense counsel's opening salvo.  Thus, the import of the evaluation has been that if the prosecutor's remarks were 'invited,' and did no more than respond substantially in order to 'right the scale,' such comments would not warrant reversing a conviction.

Young, 470 U.S. at 12-13.

This is a case in which the invited response rule helps the analysis.  In context, the prosecutor was responding to the defense attorney's arguments that she did not think the conduct was felonious and that the prosecutor had overcharged in this case.  RT 354.  The defense counsel had argued: "And what we have before us today in reference to these felony charges against Mr. Jackson is, in my humble estimation, a gross case of absolute over charging. [¶] This matter should never have proceeded as a felony.  Even if you believe every single word that the prosecutor is telling you, this is not felonious conduct."  RT 336.  This prompted the prosecutor to describe the roles of the various participants in the process and the way their tasks fit together.  He said that the police department "can only go out and arrest people" and bring them to the D.A's attention; the D.A. "can only charge people with crimes and present them to a jury;" and the Legislature defined the crimes.  RT 355.  The prosecutor then urged:

> The People of the State of California, the Legislature, the police department, the district attorney's office are powerless to do anything except bring people's behavior to the attention of the community, through a jury. [¶]  The jury is made up of people in the community.  The jury's job is to decide what the defendant did, the things that he did in their community *that fit the statute*. [¶] So the ultimate question is, is this behavior appropriate in your neighborhood?"

RT 355 (emphasis added).

The prosecutor's comments did not ask the jurors to abandon their legal duty to follow the law. Any suggestion that the jurors were to apply community standards to defendant's actions was modified by the requirement that the actions "fit the statute." Also, the jury instructions by the court reminded the jurors of their duties. They were instructed that they could not allow their decision to be influenced by sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feelings. They were instructed that statements by attorneys are not evidence and the jurors had to decide the case based on the court's instructions, disregarding any contrary statements by the attorneys. See RT 296-298. The jury is presumed to have followed the instructions and this is not a case where that presumption should be ignored. See Francis v. Franklin, 471 U.S. 307, 324-25 n.9 (1985). The prosecutor's argument did not so infect the trial with unfairness as to make the resulting conviction a denial of due process. See Darden, 477 U.S. at 181. Jackson is not entitled to the writ on this claim.

M.   Cumulative Error Claim

In some cases, although no single trial error is sufficiently prejudicial to warrant relief, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. See United States v. Frederick, 78 F.3d 1370, 1381 (9th Cir. 1996). There were not multiple errors in Jackson's trial, so there are no errors to accumulate and consider under the cumulative error doctrine.

**CONCLUSION**

The petition for writ of habeas corpus is DENIED on the merits. The clerk shall close the file.

IT IS SO ORDERED.

DATED:   September 18, 2008

_____
Marilyn Hall Patel
United States District Judge

**NOTES**

1.      This court does not apply § 2254(d) to the state appellate court's decision on this claim because that court did not have before it the federal constitutional question and therefore never decided whether any federal constitutional error was harmless.  The California Court of Appeal found harmless error in the trial court's rulings excluding the evidence.  The appellate court explained that there was error, but that "as appellant recognizes, this error is not one of federal constitutional dimensions, and the state law standard of prejudice applies."  Cal. Ct. App. Opinion, p. 10.  The appellate court then applied the less stringent harmless error standard applicable to evidentiary errors of the non-constitutional variety.  See id. (applying People v. Watson, 46 Cal.2d 818 (1956)).  This does not mean that the state court of appeal erred, but rather that it did not decide the same question this court now faces, i.e., whether there was federal constitutional error.

        Regardless of the standard the state court applied, the Brecht standard applies uniformly in all federal habeas corpus cases challenging criminal convictions under § 2254, whether or not the state appellate court recognized the error and reviewed it for harmlessness under the Chapman standard.  Fry v. Pliler, 127 S. Ct. 2321, 2328 (2007).

2.      CALJIC 5.51, was given at Jackson's trial and provided:

        Actual danger is not necessary to justify self-defense.  If one is confronted by the appearance of danger which arouses in his mind, as a reasonable person, an actual belief and fear that he is about to suffer bodily injury, and if a reasonable person in a like situation seeing and knowing the same facts, would be justified in believing himself in like danger, and if that individual so confronted acts in self-defense upon these appearances and from that fear and actual beliefs, the person's right of self-defense is the same whether the danger is real or merely apparent.

RT 318.

**United States District Court**
For the Northern District of California